**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| LEE BOWERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:19-cv-00802-TWP-DLP |
| | ) |
| ANTHEM, INC., | ) |
| | ) |
| Defendant. | ) |

<u>**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

This matter is before the Court on Defendant Anthem, Inc.'s ("Anthem") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c). (Filing No. 57.) Plaintiff Lee Bowers ("Bowers") filed an Amended Complaint alleging that Anthem violated its Key Sales Associate Agreement by refusing to pay severance benefits due him pursuant to that agreement at the time of his termination. (Filing No. 31.) Bowers' claims for breach of duty of good faith and fair dealing and for punitive damages were dismissed. (Filing No. 50.) Anthem seeks summary judgment on Bowers' remaining claim—breach of contract. For the following reasons, summary judgment is **granted**.

## I.   BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Bowers as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Bowers was hired on May 10, 1999 by UniCare, an Anthem subsidiary, to sell medical insurance and ancillary services to UniCare customers. (Filing No. 58-2 at 4.) On March 18, 2010,

Bowers was offered and accepted the position as a Specialty Sales Manager II ("SSE") with Anthem in Illinois. (Filing No. 58-3.) He sold specialty products, also called ancillary products to Anthem customers who had already purchased group medical insurance.  Specialty products include dental insurance, vision insurance, life insurance, disability insurance, and accidental death and dismemberment insurance.  In June 2012, Bowers moved to Missouri to be an SSE throughout that state. (Filing No. 58-2 at 5.)

A.     **The Key Sales Associate Agreement**

In the course of accepting the offer of employment as an SSE in Missouri, Bowers signed a Key Sales Associate Agreement (the "Agreement"), on June 29, 2012, outlining certain terms and conditions related to his employment. (Filing No. 58-4.) The Agreement made Bowers eligible for a severance benefit upon termination if he was terminated for a reason "other than For Performance or For Cause." *Id.* at 2. The Agreement defines "For Performance" as "the Sales Associate has failed to meet the performance expectations of the position after having been warned regarding the unsatisfactory performance by a prior written 30 day notice." *Id.* at 4.

The Agreement also prohibits the Sales Associate from improperly using or exposing confidential information[1] without Anthem's consent.  A Sales Associate may not "remove, copy,

---

[1] According to the Agreement, confidential information is

> plans, designs, concepts, computer programs, formulae, and equations; product fulfillment and supplier information; consumer and supplier lists, and confidential business practices of the Company, its affiliates and any of its customers, vendors, business partners or suppliers; profit margins and the prices and discounts the Company obtains or has obtained or at which it sells or has sold or plans to sell its products or services (except for public pricing lists); manufacturing, assembling, labor and sales plans and costs; business and marketing plans, ideas, or strategies; confidential financial performance and projections; employee compensation; confidential financial performance and projections; employee compensation; employee stalling and recruiting plans and employee personal information; and other confidential concepts and ideas related to the Company's business (collectively, "Confidential Information"). Confidential Information constitutes trade secrets and confidential and proprietary business information of the Company, all of which is the exclusive property of the Company.

(Filing No. 58-4 at 6.)

duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Information, except as required to perform Sales Associate's duties for the Company or its affiliates." *Id.* at 7. The Sales Associate also agrees to return all confidential information to Anthem upon termination of employment. *Id.*

**B.**     **Anthem's Specialty Sales Group**

Anthem sells specialty insurance products-- dental, vision, life, and disability insurance--in 14 states. (Filing No. 58-1 at 4-6.)  Fully insured dental insurance is its lead specialty product. *Id.* at 5.  As an SSE, Bowers was responsible for acquiring new specialty business through brokers in conjunction with the health account executive for the state of Missouri. (Filing No. 58-7; Filing No. 58-2 at 11; Filing No. 58-8 at 2-3.)  One of his primary duties as an SSE was to sell specialty insurance products for "large group" customers, meaning plans for 51 or more members. (Filing No. 58-2 at 14; Filing No. 58-1 at 7.) Bowers was also responsible for prospecting new accounts and producing revenue through new sales, generating lead activity and making sales calls to acquire new business and maximize volume.  (Filing No. 58-7; Filing No. 58-2 at 12-13; Filing No. 58-10 at 6.)  Typically, fifty percent of specialty sales is sold to clients with existing medical insurance from Anthem, while the other fifty percent consists of "stand alone" customers solely seeking specialty products. (Filing No. 58-1 at 6-7.)  As a result, SSEs partner with the medical sales executives for Anthem to cross-sell specialty products.  *Id.* at 8.  To facilitate outside sales, SSEs work with outside insurance brokers to sell specialty products, requiring them to maintain good relationships with the Anthem medical sales team and outside brokers.  *Id.* at 6; Filing No. 58-9 at 5.

SSEs report to Sales Directors. (Filing No. 58-1 at 13.) Sales Directors assist SSEs by advocating for them, either with underwriting or by working with the corporate office to ensure

SSEs are able to close sales.  (Filing No. 58-1 at 13.)  Sales Directors are typically responsible for multiple states and, as a result, oversee multiple SSEs.  *Id.*  While SSEs are technically supported by Sales Directors, Sales Directors are not directly involved in each sale an SSE makes and are often not present in an SSE's market when that SSE makes a sale.  *Id.*

Sales objectives for SSEs are set annually by Anthem's corporate finance department, with the input of executive leadership.  *Id.* at 8-9.  Anthem staff determines a national sales goal, and then assigns a fraction of that goal to each region based on the amount of medical insurance Anthem sells in that region.  *Id.* at 10-11.  As a result, SSEs across different regions have different sales goals depending on the demographics of their region and the amount of medical insurance Anthem sells there.  The parties dispute the importance of these goals.  Anthem characterizes them as expectations in the sense that if an SSE fails to reach his goals over a long enough period of time he is seen to be performing below expectations. (*See* Filing No. 58-15.) Bowers characterizes these goals as aspirations that most SSEs do not meet and are not required to meet to maintain their employment with Anthem. (*See* Filing No. 59-1; Filing No. 66-18 at 16; Filing No. 66-20 at 2; Filing No. 66-19 at 9.) Because insurance markets differ by region, Anthem representatives testified at their depositions that Anthem does not compare SSEs to one another across regions. *Id.* at 25-27; Filing No. 58-10 at 4-5.  However, other designated evidence indicates that Anthem does compare SSEs across regions using a metric called "percent to goal," which accounts for demographic differences. (Filing No. 66-18 at 15.)

To measure an SSE's performance in relation to meeting his sales goals, Anthem looks to a "Blue Report" or financial "dashboards" for each state.  (Filing No. 58-9 at 13-14.)  Blue Reports indicate by percentage how close an SSE is to meeting his sales goal for each product—or the margin by which he has exceeded that goal.  (Filing No. 59-1.)  Anthem releases these reports

monthly, and SSEs may review them independently or with a supervisor. (Filing No. 58-1 at 15, 18-19.)

**C.**   **Bowers' Performance**

     **1.**   **Background**

From July 2012 until his termination in February 2017, Bowers was the only Anthem SSE assigned to Missouri. (Filing No. 59-2 at 5, 39.) His duties and responsibilities remained the same during his time in that position. *Id.* at 13-14, 29. From 2012 through part of 2014, Bowers reported to Andrew Cassis ("Cassis"), the Sales Director for the region that contained Missouri. *Id.* at 6, 14-15.) Bowers was subject to annual performance reviews conducted by Cassis and later by other Sales Directors. (Filing No. 58-12; Filing No. 58-13; Filing No. 58-14; Filing No. 58-15; Filing No. 58-16.) Performance reviews at Anthem give each SSE a rating based on three criteria: (1) business accountability (sales goals) which accounts for 70% of the weighted rating, (2) behavioral accountability which accounts for 20% of the weighted rating, and (3) leadership accountability, which accounts for the last 10%. *Id.* Bowers received a weighted rating of 3.1 out of 5 in 2012, and a weighted rating of 3.22 out of 5 in 2013. (Filing No. 58-12; Filing No. 58-13.) Around July 2014, Stuart Watts ("Watts") replaced Cassis as the Sales Director of the region and became Bowers' new supervisor. (Filing No. 58-2 at 16.) Watts gave Bowers a weighted rating of 2.7 for 2014 and wrote that while he felt Bowers "did an overall good job," Missouri had missed its sales targets for 2014, which accounted for 70% of the score. (Filing No. 58-14 at 9-10.) He stated that for the upcoming year Bowers "really needs to work on getting out of the office more and building his broker relationships." *Id.* at 10. Bowers indicated his dissatisfaction with the review process and noted that he had placed well in Anthem's sales contests. *Id.* By mid-2015, Watts placed

Bowers, who was not meeting his sales goals[2], on a Performance Improvement Plan (the "First PIP"). (Filing No. 58-18; Filing No. 58-2 at 17; Filing No. 58-10 at 7-8.)

### 2. **First Performance Improvement Plan**

The First PIP was in effect from August 1, 2015 through October 31, 2015. (Filing No. 58-18.) It outlined three areas of improvement for Bowers: (1) increase broker call activity, (2) increase sold membership and annualized premium levels, and (3) increase sales visibility from the various specialty lead campaigns. *Id.* at 3-4. Upon receiving the First PIP, Bowers examined Anthem's Corrective Action Policy and met with human resources to discuss the PIP. (Filing No. 58-2 at 18-19; Filing No. 58-19.) Bowers took notes at that meeting where he was told the First PIP was "meant to aid in communication/expectation of goals as to where I stack up versus [my] peers." (Filing No. 58-20 at 3.) On October 15, 2015, Bowers had his first one-on-one meeting with Watts since the institution of the First PIP. (Filing No. 58-21.) At that meeting, Watts reported some criticisms that Bowers was receiving from other managers. *Id.*

Bowers did not meet his sales goals for 2015. The Blue Report for the end of 2015 shows that he achieved 64.5% of his goal for dental insurance, 57% for life insurance, 84.3% for disability insurance, and 49% for vision insurance. (Filing No. 59-3 at 10.) His performance review for that year reflected that he did not meet expectations.[3] (Filing No. 58-15 at 8.) Watts noted on his performance review that Bowers missed his sales goals and needed to improve his relationship with brokers. *Id.* at 2-3. Bowers' sales figures did not improve, and, in August of 2016, management decided to put him on another Performance Improvement Plan.

---

[2] Bowers points out that, measuring his performance by percentage-to-goal, he was not among the five worst SSEs at Anthem (out of approximately 30) in any category. (Filing No. 66 at 9.)

[3] Anthem discontinued the use of the 5-point rating system and in 2015 switched to a performance review process that describes SSEs as "exceeds expectations," "meets expectations," or "does not meet expectations." (Filing No. 58-15.)

### 3. **Second Performance Improvement Plan**

On September 6, 2016, Anthem put Bowers on another two-month Performance Improvement Plan (the "Second PIP").[4] (Filing No. 58-28.) The decision to put Bowers on the Second PIP was made by Watts and Regional Vice President of Sales, Bradley Coons ("Coons") and approved by Anthem's Associate Relations Resolution Team ("ARRT"), a division its of human resources department. (Filing No. 59-6; Filing No. 58-27.) The Second PIP listed five areas of improvement for Bowers: (1) increase broker call activity, (2) increase sold case membership and annual premium levels, (3) increase sales and specialty visibility from specialty sales partners, (4) meet with sale directors weekly to inform them of requests for proposals, and (5) improve communication with internal partners. (Filing No. 58-28 at 3.)

Bowers discussed the Second PIP with Coons and Watts on September 6, 2016 and was informed of the reasons Anthem was putting him on the Second PIP. (Filing No. 58-29.) Bowers refused to sign the Second PIP, but he testified at his deposition that he understood the PIP applied to him. (Filing No. 58-2 at 31.) The Second PIP states:

**Performance Improvement Plan Unsuccessful –**

NOTE: This document does not alter the at-will nature of your employment

*If you fail to meet or exceed all of the Performance Improvement Plan Goals, Measures/Metrics, and Timing, you may be subject to Corrective Action as defined by the Corrective Action Policy; up to and including termination.*

(Filing No. 58-28 at 5) (emphasis in original).

After the Second PIP went into effect, Coons continued to receive feedback from Anthem employees about Bowers' performance. One account manager commented that Bowers had "lost credibility with his team," and several brokers refused to work with Bowers entirely. (Filing No.

---

[4] Anthem sent Bowers the Second PIP by e-mail on September 6, 2016 (Filing No. 58-28), but Coons did not sign it until September 30, 2016 (Filing No. 68-4). Bowers did not sign the Second PIP.

59-7; Filing No. 58-31.)  In November 2016, management made a decision, with the approval of human resources, to move Bowers to a Corrective Action Plan (the "CAP"). (Filing No. 58-32; Filing No. 58-33.) On November 21, 2016, Bowers met with Coons and Watts via telephone to discuss feedback upon completion of the Second PIP. (Filing No. 58-34.) On November 28, 2016, Coons wrote to Bowers advising him that he would be placed on a 60-day CAP because he failed to meet his sales goals and there were areas in which he was not performing satisfactorily. (Filing No. 58-35.)

### 4.   **Corrective Action Plan**

Coons told Bowers that the two of them would continue to meet with Watts weekly to review the CAP.  *Id.*  The CAP itself discussed the Second PIP and noted that, while Bowers had improved in some areas, he still needed to improve in others.  *Id.* at 8-9. It outlined the areas Bowers needed to improve upon, which were generally the same areas identified in the Second PIP plus a requirement to improve his presentation skills.  *Id.*  The CAP states:

> **This Written Warning will be in effect until January 31, 2017**. If at any time during the warning period or thereafter you do not meet the expectations, you do not make sufficient progress toward meeting the stated expectations, or are not able to sustain the improvement, additional corrective action may be taken, up to and including termination of your employment.

*Id.* at 9 (emphasis in original).

Bowers understood that Anthem could terminate his employment if he did not meet the goals outlined in the CAP. (Filing No. 58-2 at 34, 37.) When he received the Second PIP, and subsequently the CAP, he did not complain to human resources or anyone else at Anthem that he thought he was being treated unfairly.  *Id.* at 36; Filing No. 58-9 at 19; Filing No. 58-1 at 23. Bowers continued to meet with Coons and Watts in accordance with the CAP. (Filing No. 58-36.)

By January 2017, Watts had transitioned to a new role within the company and Jole Burghy ("Burghy") became the new Sales Director to whom Bowers reported. (Filing No. 58-9 at 4.)

Burghy did not make any decisions with respect to the CAP, but as Bowers' new supervisor, she was informed of his performance issues.  (Filing No. 58-9 at 7.)  She also received complaints about Bowers from Anthem staff, including a member of the medical membership team.  *Id.* at 7-10.  On January 24, 2017, Coons sent an email to Bowers and Burghy with updated results for the CAP in advance of their planned meeting that day. (Filing No. 58-37.) Coons also sent the Missouri financial dashboard results through December 2016, which demonstrated that Bowers had not met his sales goals. (Filing No. 59-8.) The three met that day and discussed that Bowers had not met the performance goals outlined in the CAP. (Filing No. 58-39; Filing No. 58-2 at 35-37.)

On January 31, 2017, Coons wrote to Bowers to schedule a meeting with him the following Monday to review the CAP and Bowers' January sales numbers. (Filing No. 58-41, Filing No. 58-2 at 37.) Coons planned to terminate Bowers' employment at that meeting. (Filing No. 58-40.) Bowers responded that he was planning to submit a complaint to the ARRT because he felt he had been "grossly misrepresented." (Filing No. 58-41.) Coons immediately contacted the ARRT to determine his next steps and was told not to have the planned meeting with Bowers' until the ARRT could investigate the complaint. (Filing No. 58-43; Filing No. 58-1 at 23.)

Bowers submitted his complaint to the ARRT on February 3, 2017. (Filing No. 58-42.) The complaint stated he had suffered "age discrimination, working in a hostile work environment, intimidation and derisive comments directed at me which are not in compliance with the Anthem company values or other laws associated with these topics." *Id.* The ARRT conducted an investigation into Bowers' complaint and interviewed relevant individuals regarding the allegations. (Filing No. 59-9; Filing No. 59-10.) On February 7, 2017, the ARRT concluded its investigation, determining that Bowers "was not looking for a resolution at this time … he was just wanting this information documented." (Filing No. 59-10 at 6.) The ARRT's report also said

that it could not substantiate Bowers' allegations.  *Id.*  On February 14, 2017, the ARRT approved Coons' recommendation that Bowers be terminated "based on performance." ([Filing No. 58-47 at 2](#).) On February 24, 2017, Coons met with Bowers to terminate his employment, telling him he had not met certain corrective action plan perimeters.  ([Filing No. 58-1 at 23](#).) Anthem did not give Bowers any severance pay upon his termination.

**D.    Confidentiality**

During discovery in this case, Anthem learned that Bowers on multiple occasions sent Anthem's confidential information to his personal e-mail address and failed to return that confidential information to Anthem following termination of his employment. ([Filing No. 58-2 at 40](#).) Bowers sent these items to his personal account as "part of [his] course of doing [his] normal job." *Id.* At the time, he did not disclose these actions to anyone at Anthem, nor did he seek permission from anyone to forward confidential information to his personal account.  *Id.* at 41-42.

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007).  A disputed fact must be "material," which means that it might affect the outcome of the case under the applicable substantive law. *Liberty Lobby*, 477 U.S. at 248.  Disputes over irrelevant or unnecessary facts do not preclude

summary judgment. *Id.* A genuine dispute of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

## III.   DISCUSSION

Bowers' remaining claim in this action is for breach of contract.  Anthem asks for summary judgment, arguing there are no disputed material facts and that it is entitled to judgment as a matter of law because it terminated Bowers for poor performance, and the Agreement unambiguously does not require severance payment in that circumstance. (Filing No. 58 at 22-26.) Anthem further argues that Bowers' own breach of the confidentiality clause of the Agreement negates his claim. *Id.* At 26.  Bowers argues that he was not fired for performance, and that Anthem failed to provide him with a 30-day notice before terminating him, which is required for a termination for performance under the Agreement. (Filing No. 66 at 20.) He also argues that e-mailing work documents to his personal account was necessary to do his job and even if that was not the case,

violation of the confidentiality portion of the Agreement would not allow Anthem to refuse to pay

him severance.  *Id.* at 27.  The Agreement specifically states:

> If the Sales Associate's employment is terminated by the Company, other than For
> Performance or For Cause, Company agrees to provide the following enhanced
> severance benefit…
>
> "For Performance" means the Sales Associate has failed to meet the performance
> expectations of the position after having been warned regarding the unsatisfactory
> performance by a prior written 30 day notice.

(Filing No. 58-4 at 2 and 4.)

The elements of a breach of contract claim are: (1) a contract existed, (2) the defendant

breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach."

*Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007) (citing *Breeding v. Kye's, Inc.*,

831 N.E.2d 188, 191 (Ind. Ct. App. 2005)).  The parties agree that the first and third elements are

satisfied, it is the second element—whether Anthem breached that contract—that is in dispute. In

breach of contract cases, the court's primary objective is to determine the intent of the parties at

the time the contract was made, accomplished by examining the language the parties used to

express their rights and duties. *Trustcorp Mortg. Co. v. Metro Mortg. Co., Inc.*, 867 N.E.2d 203,

212–13 (Ind. Ct. App. 2007). Where terms of a contract are clear and unambiguous, courts will

apply the plain and ordinary meaning of the terms and enforce the contract according to its express

terms. *Entertainment USA, Inc. v. Moorehead Comm'ns, Inc.*, 93 F. Supp. 3d 915, 923 (N.D. Ind.

2015).

The key question is whether Anthem terminated Bowers "for performance." The

Agreement is unambiguous—if Bowers was terminated for cause or for performance, he is not

entitled to severance pay.  (Filing No. 58-4 at 2 ). Under the Agreement, termination for

performance has two elements. The employee must have (1) "failed to meet the performance

expectations of the position after" (2) "having been warned regarding the unsatisfactory performance by a written 30 day notice." *Id.* at 4.

A.   **Performance Expectations**

Bowers argues that neither element is satisfied here.   As to the first, he argues that at the time of his termination, he was meeting the performance expectations of the position.   He does not dispute that he had failed to meet some of his sales goals over the past few years, but he argues that "meeting sales goals cannot be the proper yardstick because they are aspirational rather than mandatory." (Filing No. 66 at 24.) Bowers contends that SSEs routinely fail to meet sales goals but they are rarely disciplined or terminated for it.   *Id.*   He argues "[t]he most accurate and reliable measure of the performance of the SSEs, a jury could reasonably find, was the extent to which they approached their sales goals – their percentage to goal – even when they did not reach 100%." *Id.* at 25.   He asserts that he routinely fared better than some other SSEs in percentage-to-goal metrics.

Bowers makes a compelling case that an SSE's percentage-to-goal numbers *should* constitute a significant portion of Anthem's performance evaluations.   However, he is unable to produce evidence to support a crucial element of his argument—that an SSE who is outperforming other SSEs in percentage-to-goal metrics *is* meeting Anthem's expectations. The designated evidence shows that Anthem assesses many qualities to determine whether an SSE is meeting its expectations.   Performance reviews show that generally only 70% of an SSE's performance is based on sales.   (Filing No. 58-15.)   SSEs are also judged by their "competencies," such as taking responsibility, building relationships, embracing risk, and more.   *Id.*   Additionally, while trying to improve Bowers' performance, Anthem emphasized qualities other than sales, including

13

communication skills, attention to detail, and presentation ability, that it expected Bowers to develop.  (Filing No. 58-28; Filing No. 58-35.)

Bowers cites no evidence that an SSE who is outperforming some other SSEs by percentage-to-goal is meeting Anthem's expectations.  He cites to Burghy's deposition, where she said that the Blue Reports are "the source of truth" about an SSE's sales.  (Filing No. 66-18 at 15.) But Bowers cherry-picks that quote out of a line of questioning where Burghy identifies other measures of an SSE's performance, specifically "internal and external relationships" and "prospect activities."  *Id.*  Bowers points out that in 2016, when Anthem issued him the Second PIP and the CAP, his performance, "as measured by the percentage-to-sales goal standard, exceeded that of several other SSEs who were not placed on such Plans." (Filing No. 66 at 26.) That fact is undisputed, but it belies Bowers' argument that percentage-to-goal numbers are Anthem's only measure of an SSE's performance. If those numbers were the only determinant of an SSE's performance, the SSEs with worse percentage-to-goal statistics would likely have also been placed on PIPs.  The fact that Anthem placed Bowers on a PIP and a CAP and did not do so with employees performing worse than he when measured by percentage-to-goal numbers only supports the inference that Anthem considers factors other than performance-to-goal metrics when evaluating an SSE's performance.

Bowers argues that "a jury could reasonably conclude that the PIP and the CAP were unfair on their face" because he received them in the middle of quarters, and thus had less than a full quarter to achieve the quarterly goals they mandated. *Id.* at 26-27. But this argument mischaracterizes the evidence.  Both PIPs and the CAP made clear that the target sales numbers applied to the entire quarter, not just the 60-day period that the PIP or CAP would be in effect. (Filing No. 58-18 at 4 (stating that the measure for Bowers to meet his sales goals was "Aug-

Nov"); Filing No. 58-28 at 4 (same); Filing No. 58-35 at 5 (same).)  Moreover, whether a juror might agree with Bowers that he faced "unfair" remedial action is not determinative of whether he was meeting Anthem's expectations. The PIPs and the CAP support that Bowers was not meeting Anthem's expectations because they show that Anthem's directors felt he needed to improve his performance.

Bowers also argues pretext. He cites to *Snelling v. Clarian Health Partners, Inc.*, which states, "Courts have recognized that pretext can be proven by showing that a supervisor set an employee up to fail." 184 F.Supp.2d 838, 852-53 (S.D. Ind. 2002) (citing cases). In *Snelling*, the plaintiff's supervisor had devised a corrective action plan that even he acknowledged was probably not possible for the plaintiff to achieve. *Id.*  The Court denied summary judgment, finding that the supervisor's credibility became an issue of fact when he admitted to concocting an unachievable corrective action plan. Distinguishing *Snelling* from this case is the fact that Bowers cites no evidence, including his own deposition testimony, that the goals outlined in the PIPs or the CAP were unachievable, or that Anthem devised them in bad faith to justify his termination.  At best, the record Bowers relies on establishes that, because there is a lag between a sale and an "effective date" (i.e., the date insurance coverage began), some of the sales he was working on during the improvement periods would not be reflected in his sales statistics at the end of those periods. (Filing No. 66-18 at 17; Filing No. 66-19 at 17.)  He does not explain, and the record evidence does not show, how that fact makes the goals set forth in the improvement plans unachievable. Bowers has provided no evidence that Anthem set him up to fail by expecting him to achieve unreasonable or unachievable goals, and thus *Snelling* does not apply.

Last, Bowers disputes the idea that his communication and collaboration skills were deficient.  If that were the case, he argues, "his sales numbers would have been deficient too."

Filing No. 66 at 27. Bowers offers no support for this assertion of fact. Instead, he cites four age discrimination cases from various federal appellate courts, which he contends indicate that "[c]ourts have turned a skeptical eye to an employer's complaints about the way that a salesman goes about his work when the bottom line result—his sales numbers—are satisfactory." *Id.* These four cases[5] are distinguishable because they are age discrimination cases, not breach of contract cases. In other words, in each case Bowers cites, the plaintiff argued that an employer fabricated reasons to terminate an employee who was performing well as a pretext, while really the employer was firing the employee because of his age. Here, Bowers offers no other explanation for his termination that these poor performance reviews and improvement plans were putatively a pretext for age or some other form of discrimination. If Anthem managers fabricated his poor sales performance and his deficient communication skills as a pretext for his termination, what was the real reason for his termination? Bowers does not explain what reason, other than that he failed to meet his supervisors' expectations, Anthem would have for firing him—and the Court finds no evidence in the record that the justifications for his termination were a pretext.

There is evidence in the record that Bowers was not the lowest-performing SSE at Anthem from a percentage-to-goal perspective in any one category. But that evidence is immaterial to his contention that he was meeting Anthem's expectations. All of the evidence in the record— especially the performance reviews and the multiple improvement plans—supports the inference that Bowers failed to meet Anthem's expectations.

---

[5] The cases are *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 920 (8th Cir. 1992); *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 426-27 (7th Cir. 1992); *Courtney v. Biosound*, 42 F.3d 414, 423 (7th Cir. 1994); *Brewer v. Quaker State Oil*, 72 F.3d 326. 332 (3d Cir. 1995).

**B.**     **Written 30-Day Notice**

Next, Bowers argues that Anthem failed to fulfill the contract's requirement that, in order to fire him for performance, it was required to warn him "regarding the unsatisfactory performance by a prior written 30 day notice." (Filing No. 58-4 at 4.) He argues,

> Mr. Bowers was discharged on February 24, 2017. Thirty days prior to this date was January 25, 2107. No written notice was given to Mr. Bowers at this time which informed him that he was going to be fired and which gave him the benefit of the thirty-day cure period. Just the opposite. [Anthem] has acknowledged that Mr. Coons, its Regional Vice President of Sales, recommended that Mr. Bowers be terminated on January 31, 2017 and that the recommendation was approved by the Associate Relations Resolution Team of the company on February 14, 2017…. This means that during the thirty days before Mr. Bowers was let go [Anthem] was not affording him the opportunity to improve his performance to a satisfactory level as required by the employment contract.

(Filing No. 66 at 21.)

Anthem responds that the CAP it placed Bowers on in late 2016 serves as a "written warning that warns him that his employment could be terminated if he failed to meet the goals outlined therein." (Filing No. 69 at 17 (emphasis deleted).) And indeed, the CAP, issued on November 28, 2016, states that

> **This Written Warning will be in effect until January 31, 2017.** If at any time during the warning period or thereafter you do not meet the expectations, you do not make sufficient progress toward meeting the stated expectations, or are not able to sustain the improvement, additional corrective action may be taken, up to and including termination of your employment.

(Filing No. 58-35 at 9) (emphasis in original).[6]  On its face, that seems to be sufficient to serve as the 30-day notice required in the Agreement.

But Bowers argues it is not sufficient for two reasons.  First, he contends the CAP does not qualify as the 30-day notice because it does not "provide clear and unequivocal notice to the employee that he <u>will</u> rather than <u>might</u> be fired from his job unless he rectifies his alleged

---

[6] Both PIPs contained similar warnings. (Filing No. 58-18 at 4; Filing No. 58-28 at 5.)

substandard job performance within the prescribed period of time." (Filing No. 66 at 21) (emphasis in original). Second, Bowers takes issue with the timing of his termination, which took place on February 24, 2017, a few weeks after the January 31, 2017 date on which the CAP expired. *Id.* He argues that exactly 30 days prior to that date of his firing (which in this case would be January 25, 2017) Anthem was required to give him written notice that he would be fired unless he cured his performance within the next 30 days. *Id.* Absent that, he argues Anthem was required, instead of firing him on February 24, 2017, to give him notice that day and fire him on March 26, 2017 (30 days later) if his performance did not improve. *Id.* at 23.

These arguments are untethered from the clear and unambiguous language of the Agreement, which again, merely requires that his termination come "after having been warned regarding the unsatisfactory performance by a prior written 30 day notice." (Filing No. 58-4 at 4.) The Agreement does not express that Anthem must warn an employee that it will fire him, or even that it might fire him, if his performance does not improve. It requires only that, to terminate an employee for performance, Anthem must warn him "regarding [his] unsatisfactory performance" in a prior written 30-day notice.

The November 28, 2016 CAP clearly satisfies this requirement. It explains several times that Bowers' performance is not satisfactory. Under the "Reason for Corrective Action" heading, the box for "Job Performance" is checked. (Filing No. 58-35 at 8.) The CAP references the Second PIP and indicates that Coons and Watts saw "other areas that need improvement." *Id.* The document then outlines specific areas where Bowers' performance is unsatisfactory, including that he was "not enhancing relationships with key medical reps your are aligned to," that his "credibility with medical sales associates and brokers continues to lack the level needed to do the job most effectively," and that "there is room for improvement when [he speaks or presents] in meetings."

*Id.* at 9.  The CAP is a clear written warning that Bowers' performance is not satisfactory.  It also includes the passage quoted above, which warns Bowers that he could face termination if he fails to meet the goals in the CAP.  As to the question of whether Anthem could terminate Bowers for performance, that warning is superfluous—the Agreement only required Anthem to warn Bowers that his performance was not meeting its expectations.

Bowers' argument that Indiana courts require strict compliance with notice-and-cure provisions in contracts is unpersuasive.  The question here is what the contract required Anthem to give notice of.  Anthem argues it was only required to give notice of poor performance, while Bowers argues Anthem was required to give him "plain and unmistakable notice of the company's firm and definite intent to fire him." (Filing No. 66 at 22.) The plain language of the contract supports Anthem's interpretation.  Given that language, Anthem strictly complied with the notice-and-cure provision.  Bowers argues that Anthem "did not provide Mr. Bowers with written notice of its intent to terminate him followed by an opportunity to improve his job performance over the course of thirty days." *Id.* at 24.  Whether that assertion is true is irrelevant because the Agreement did not require Anthem to inform Bowers that it intended to terminate him, it only required that it give him notice of his unsatisfactory performance.  The evidence in the record shows conclusively that Anthem did so.

Bowers' second argument on this issue, that the timing of the CAP disqualifies it from serving as notice under the "For Performance" provision of the Agreement, is less clearly articulated.  He appears to argue that Anthem was required to give notice exactly 30 days before terminating him. *Id.* at 21.  Absent that exact procedure, "during the thirty days before Mr. Bowers was let go [Anthem] was not affording him the opportunity to improve his performance to a satisfactory level." *Id.*

This argument again attempts to insert language into the Agreement that is not there. To terminate him for cause, the Agreement merely required Anthem to terminate Bowers "after [his] having been warned regarding the unsatisfactory performance by a prior written 30 day notice." (Filing No. 58-4 at 4.) The termination must come after the 30-day notice—the Agreement does not say anything about how long after. That there was a delay of a couple of weeks between the end of the CAP's effective period and the date of termination is irrelevant.[7] So long as termination came after the notice, which all parties agree that it did, it complies with the "For Performance" clause of the Agreement. Bowers' interpretation is not supported by the plain language of the contract.

The Court finds that Anthem did comply with the notice requirement in both content and procedure. Moreover, Anthem complied with both elements of the "For Performance" clause of the Agreement—that Bowers was not meeting performance expectations and the Anthem provided him with sufficient notice before terminating him. No questions of fact based on evidence in the record exist that would allow a reasonable juror to find otherwise. Therefore, Anthem has negated the second element of Bowers' breach of contract claim—that there was a breach. Bowers' claim cannot succeed without showing a breach, and therefore summary judgment is warranted in this case. Because the Court has determined that Bowers cannot prove an element of his claim, it need not address Anthem's affirmative defense that Bowers' breached the contract himself by misusing Anthem's confidential information.

---

[7] The Court notes that there is evidence in the record that shows Coons began setting Bowers' termination in motion on January 31, 2017, the day the CAP expired. On that day he emailed the ARRT to let them know that he would be terminating Bowers' employment on the following Monday, February 6, 2017. (Filing No. 58-40.) He also emailed Bowers to set the meeting. (Filing No. 58-41.) The only reason Bowers was not terminated on that date was because he informed Coons that he was submitting a complaint to the ARRT because he felt he had been misrepresented. *Id.* Coons delayed his termination to allow the ARRT to investigate the complaint.

## IV.  CONCLUSION

For the reasons stated above, the Court **GRANTS** Anthem's Motion for Summary Judgment (Filing No. 57), as to Bowers' claim for breach of contract.  This ruling resolves this matter as to all parties and all claims.  Final Judgment will issue in a separate order.

**SO ORDERED.**

Date:  7/20/2020

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kevin W. Betz
BETZ & BLEVINS
kbetz@betzadvocates.com

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Claire Bruner-Wiltse
SEDEY HARPER WESTHOFF PC
cbruner-wiltse@sedeyharper.com

Courtney E. Endwright
BETZ & BLEVINS
cendwright@betzadvocates.com

Hoorya R. Ahmad
SEYFARTH SHAW LLP (Chicago)
hahmad@seyfarth.com

Erin D. Foley
SEYFARTH SHAW LLP
edfoley@seyfarth.com

Chad Harrison Holler
BETZ & BLEVINS
choller@betzadvocates.com

Robyn E. Marsh
SEYFARTH SHAW LLP
rmarsh@seyfarth.com

Mary Anne Sedey
SEDEY HARPER WESTHOFF PC
msedey@sedeyharper.com